# ALBAUGH

*v.*

# LITHO–MARBLE DECORATING COMPANY.

---

# LITHO–MARBLE DECORATING COMPANY

*v.*

# ALBAUGH.

---

APPELLATE PRACTICE; EQUITY PLEADING AND PRACTICE; ANSWER
AS EVIDENCE; PRINCIPAL AND AGENT; LEASE; MECHANICS'
LIENS; NOTICE; PRIORITIES.

1. Where the complainant and defendants all appeal from a decree
in an equity suit, and the appeal by the complainant is from
the whole decree and brings the whole case and all the parties
to this court, a motion by the complainant to dismiss the appeal
of certain defendants upon the ground that they have no right·
of appeal, inasmuch as they had been proceeded against by
publication in the court below and no appearance had been
there entered for them, will be overruled.

2. An allegation in a bill in equity that two of the defendants acted
as agents for a third defendant, when positively denied by the
former in their answers and unsupported by any testimony
whatever, must be regarded as conclusively disproved by the
answers, although a decree *pro confesso* has been taken against
the alleged principal upon her failure to answer.

3. A covenant in a lease for the erection by the lessee of a building
on the leased premises, to become the property of the lessor at
the end of the term, without charge to the lessor, her heirs or
assigns, does not create the relation of principal and agent
between the lessor and lessee, so as to bind the lessor and her
property for the contracts of the lessee made in the perform-
ance of the covenant, and under such circumstances a bill in
equity to enforce a mechanic's lien against the leased property
for work and labor done for the lessee in the erection of the
building is maintainable only against the leasehold interest.

4. *Quaere*, whether the lien of a contractor furnishing labor and ma-
terial for a building will take precedence of a deed of trust

14 Ct. App.—9

executed more than three months after the contractor claimed to have completed his work, during which time he had no men at work and there was reason for persons dealing with the owner to suppose the work had been finished, and where neither the trustees nor the beneficiary under the deed of trust had notice of a supplemental agreement between the owner and contractor, by the terms of which certain defects in the work w.ere to be remedied and in accordance with which additional work was done several months after the date of the deed of trust. .

5. A decree in a suit to enforce a mechanic's lien for work done and materials furnished, *reversed,* upon the ground that the testimony was insufficient upon which to base a decree, and the cause *remanded* with directions to refer the cause to the auditor for a finding of facts upon the testimony taken and such additional testimony as might be adduced before him, or to have issues formulated for the determination of the facts by a jury, or to permit the parties under the control and direction of the court, to institute a suit at law for the determination of such facts—in the discretion of the lower court.

Nos. 846 and 847.   Submitted December 14, 1898.   Decided January 3, 1899.

HEARING on appeals and cross-appeal from a decree of the Supreme Court of the District of Columbia in a suit to enforce a mechanic's lien.  *Reversed.*

The COURT in its opinion stated the case as follows:

These are cross-appeals from the same decree.

On December 15, 1894, Mrs. Harriet S. Blaine, who then was, and yet remains, the owner in fee simple of certain lots of ground in Square 221, in the city of Washington upon which at the time stood a building used as a residence, executed a lease thereof for ninety-nine years to one Paul D. Connor, with the covenant therein contained that the lessee, his executors, administrators, or assigns, would erect a building on the premises at his or their own expense at a cost of not less than seventy-five thousand dollars, which was to be surrendered to her, her heirs or assigns, at the end of the term, without charge to her or them, and in the meantime should be kept insured for her and their benefit in the sum of forty thousand dollars. The

lease is not set forth in the record, and its contents are not otherwise disclosed than as far as here stated. The building proposed to be erected was a theatre or opera house.

Connor assigned his lease to John W. Albaugh, who took it as it appears, as trustee for himself and his associate, Uriah H. Painter; and Albaugh and Painter proceeded to construct the proposed opera house, which they designated by the name of the Lafayette Square Opera House. They contracted, among others, with the Litho-Marble Decorating Company, a corporation under the laws of the State of Illinois, resident in the city of Chicago. Their contract was for the construction of certain work, known as *scagliola* work, an imitation of marble, for the specified price of $3,100, and was executed on July 15, 1895. The work was to be commenced as soon as the groundwork to receive it was in place, and was to be all thoroughly completed before September 15, 1895, with a reservation for an allowance of further time in the event of delay occasioned by the owners of the building or their other contractors. It was the purpose to have the opera house ready for dramatic performances by the end of September, 1895.

Delays occurred, and disputes arose in reference to the quality of the work performed. But, although the greater part of the testimony is devoted to the transactions between the parties at this period, we do not deem it necessary here to enter into any investigation of the occurrences of that time. These occurrences appear to us to have been disposed of by the subsequent arrangement between the parties.

Besides the specific work provided for by the contract of July 15, 1895, there was a certain amount of extra work done at the request of Albaugh and Painter, or their architect. On October 16, 1895, the Litho-Marble Decorating Company rendered a bill for the whole amount, from which it appears that they claimed to have done extra work of the

value of $406.50, and all the work under its specific con-
tract,—the whole amounting to $3,506.50, upon which
there was a credit of $1,000 paid at some time on account.
With the exception of one item of $36, which they scratched
out, this bill was endorsed as correct by the architects, who
were constituted by the contract as arbiters between the
parties. In a letter of October 14, 1895, two days before
the rendition of this bill, the principal architect had writ-
ten to the company to the effect that, although he could
not say that he was satisfied with the work, possibly it was
as good as could be done "in the senseless rush that
occurred."

The matter, however, was not satisfactory to Albaugh and
Painter. An inspector for the company came from Chicago
to inspect the work in November of 1895. This inspector
afterwards testified in the case that it would then (November,
1895) take about $250 to put the work in first class condition
and that he had so stated to the architect. To this inspector
it seems Albaugh and Painter made a proposition to settle
by a payment of one-half of the amount of the bill. This
the company, in a letter to the architect of November 23,
23, 1895, refused, and insisted on payment of the whole
amount. In answer to this a copy of a letter from the archi-
tect in his handwriting and under date of November 25,
was introduced in evidence, not, however, without strenuous
objection on the part of counsel for the company. In this
letter the architect urged the acceptance of the 50 per
centum offered, and stated that the company's own agents,
after inspection, had acknowledged to him that the work
was so defective that they regarded 50 per centum as a
fair compensation for it.

It is evident that the work was not entirely satisfactory
at this time (November, 1895); and the result of the nego-
tiations was that, on December 3 and December 11, 1895,
the parties entered into a supplemental contract, which was
in these terms:

" WASHINGTON, D. C., December 3, 1895.

"In the Matter of Contract between the Litho-Marble Decorating Co. and J. W. Albaugh and U. H. Painter, Owners, for Litho-marble, Mosaic Tile, &c., in the Lafayette Square Opera House, at Washington, D. C., dated July 15, 1895.

Contract price...................................  $3,100 00
Payment on account heretofore received.........  1,000 00
          Balance ...............................  $2,100 00

" Certain *extra work* was executed by said company, the quantity of which is still in dispute, and the ascertainment of exact quantities of such extra work is reserved for consideration between the parties at the time of final adjustment when contract work is entirely completed.

" The Litho-Marble Decorating Company now acknowledges the receipt of nine hundred and twenty dollars as a payment on account of said contract and extras thereunder.

" The said company accepts this payment on the express condition that the said owners agree to allow the company to enter upon and complete said work, without interruption, at a date not later than June 15th, 1896, and that upon such completion, in accordance with the terms of said original contract, the balance of the contract price shall be promptly paid, and in evidence of the acceptance of such condition the said owners have countersigned this paper this eleventh day of December, 1895."

Things seem to have been left in abeyance after this for several months, presumably because the season for dramatic performances was in progress at the time; but in June of 1896, probably at the termination of this season, the Litho-Marble Decorating Company sent two workmen from Chicago to continue and to complete the work, which it is claimed was accomplished within three weeks thereafter. In the meantime there had been a further payment of $25 on account.

On September 22, 1896, there having been no payment of the residue of the money claimed by the company, it filed

a notice of lien, in pursuance of the statute, for the sum of $1,561.50, with interest from July 15, 1896; and on October 10, 1896, it instituted the present proceedings by the filing of a bill in equity to enforce the lien. Albaugh and Painter and Mrs. Blaine were made defendants to the bill, as were also certain other persons who had filed notices of lien, and likewise the trustees and beneficiary under a deed of trust which had been executed by Albaugh on January 3, 1896. In this bill of complaint, besides the facts in connection with the work, it was alleged that the defendants, Albaugh and Painter, had entered into the original contract with the company "as the duly authorized agents of the defendant Harriet S. Blaine and with her knowledge and consent."

Albaugh and Painter answered the bill, and denied all its substantial averments. They denied also that they were in any manner the agents of Harriet S. Blaine, or acted as such in the premises. One of the other lien claimants also answered, stating that it had assigned its claim and no longer had any interest in the subject-matter of controversy. The trustees and beneficiary under the deed of trust answered denying that their deed was subordinate to the lien of the complainant company. Mrs. Blaine, who had been served with process only by way of publication, did not answer; and against her and some others the bill was taken as confessed, and the decree *pro confesso* was made final at the hearing.

Testimony was taken, which bore exclusively on the controversy between the complainant company and the defendants, Albaugh and Painter, with reference to the character and quality of the work done; and at the hearing a decree was rendered in favor of the complainant company for the sum of $1,311.50, with interest thereon from July 15, 1896; and it was adjudged that the complainant had a lien for that amount on the whole and entire estate, including not only the leasehold interest of Albaugh and Painter, but also

the fee simple interest of Mrs. Blaine; and it was ordered that, if the amount so found due should not be paid to the complainant within twenty days, the property should be sold; and that if the proceeds of sale should be insufficient to pay the lien, the decree should stand as a personal judgment against Albaugh, Painter and Mrs. Blaine.

From this decree an appeal was noted on behalf of all the defendants; and subsequently an appeal was taken also on behalf of the complainant company. And the case is now before us on both appeals.

*Mr. Henry P. Blair* and *Mr. Corcoran Thom* for the appellants, the defendants below.

*Mr. Chapin Brown* and *Mr. Arthur H. O'Connor* for the appellants, the complainants below.

Mr. Justice MORRIS delivered the opinion of the Court:

1. In this court a motion was made to dismiss the appeal of Mrs. Harriet S. Blaine and two other defendants who had been proceeded against by process of publication, on the ground that, inasmuch as no appearance had been entered for them, they had no right of appeal, their remedy being, as it was claimed, by a petition for a rehearing in the court below under the provisions of the Act of Maryland of 1773, Ch. 7, Sec. 4. This motion was postponed to the hearing on the merits, and now comes up for determination. We think that the act of Maryland, to which reference is made, is not at all applicable to this case, and that the motion is not well founded. But it is sufficient for us here to say, that the complainant company by its own appeal, which in terms is an appeal from the whole decree, has brought the whole case and all the parties into this court; and it would gain nothing by the allowance of its motion, even if it were otherwise well founded. The motion therefore must be denied.

2. Proceeding to a consideration of the case on its merits,

we are unable to find any ground upon which any decree in the premises against Mrs. Harriet S. Blaine can be sustained. The allegation of the bill of complaint that Albaugh and Painter acted as her agents is positively denied by them in their answers; and if the allegation is to be regarded as the assertion of a matter of fact, there being no testimony whatever in support of it and not even the pretense of testimony, it must be regarded as conclusively disproved by the answers. And if the statement is unfounded with regard to Albaugh and Painter, it can not be taken as true with regard to Mrs. Blaine, notwithstanding the decree *pro confesso* against her. For it is too plain for argument that, if there were no agents, there could be no principal. The condition of agency is one which necessarily requires two parties to it. If, on the other hand, the allegation of the bill is intended to be the assertion merely of an inference of law from the relation of lessor and lessee, subsisting between Mrs. Blaine, on the one side, and Albaugh and Painter, on the other, and the covenant in the lease for the erection of a building by the lessee to become the property of the lessor at the end of the lease, without charge to her, the proposition is wholly untenable. The lease is not given in the record; and we may therefore presume that there is nothing that would aid the complainant's contention other than the covenant which has been cited. But this covenant involves no theory of agency, but quite the reverse. The parties to the lease dealt with each other, not as principal and agent, but practically as adverse parties. To hold that a lessor, covenanting with a lessee for the security of his interest under the lease, the payment of rent, probably, should construct a building upon the land in place of one to be demolished, would thereby and by virtue of such a covenant make the lessee his agent and bind himself personally, as well as his property, for the contracts of the lessee in the performance of the covenant, seems to us to be wholly without warrant either in law or in reason;

and we greatly question whether even the most positive legislation could impose liability upon one person for the obligations of another in such a contingency. Certainly no such liability is imposed, or sought to be imposed, by our mechanics' lien law. The covenant in question is itself evidence of the intention of all the parties that the lessor should not be bound; for it specifically provides that the building should be surrendered at the end of the lease *without charge to the lessor, her heirs or assigns.*

It is very clear to us that the decree, as against Mrs. Harriet S. Blaine, is erroneous in every aspect of it, and that as to her the bill of complaint should have been dismissed. If there is any liability in the premises, it is only that of Albaugh and Painter in respect of the leasehold interest which they hold.

3. Whether the complainant's lien takes precedence of the deed of trust executed in January of 1896, to the defendants, Johns and Porter, to secure the defendant, Euterpe Kinsbury, is a question that admits of grave doubt. The complainant company in October and November of 1895 claimed to have finished its work in the previous September as well as it could have been done under the circumstances. Albaugh and Painter appeared to the world to be in full possession in and after that month of September; and so far as this record shows, there were no workmen there thereafter before the execution of this trust, and there was reason for those dealing with the owners to assume that the work had been finished; and it is not shown that the trustees or beneficiary in the deed of trust had any knowledge of the supplemental contract of December 11, 1895, between the company and Albaugh and Painter. It may, therefore, be questioned whether the trustees and beneficiary in the deed of trust were not justified in dealing with the property, so far as the complainant company is concerned, on the assumption that it had been settled with, the three months allowed by the mechanics' lien law for the filing of notice

of lien having apparently expired. But, in the present con-
dition of the case, it is probably unnecessary for us to deter-
mine this question; and we desire to be distinctly understood
as not determining it in any manner, or precluding further
inquiry into the facts, if such should be deemed necessary.

4. The main, and we may say, the substantial contro-
versy in this case is between the complainant company, on
the one side, and the defendants, Albaugh and Painter, on
the other; and upon the issues between these parties we
find ourselves constrained to come to a somewhat different
conclusion from that reached by the learned justice who
heard the cause in the court below.

The claim of the complainant is for $1,561.50; the de-
cree allows $1,311.50. The difference is the result of a
deduction of $250 based exclusively on the testimony of one
of the witnesses for the complainant, who testified that in
November, 1895, he had inspected the work for the com-
pany, that it was not then in first class condition, and that
it would require about $250 to put it in first class condition.
But all this was before the execution of the supplemental
contract of December, 1895; and as, under that supple-
mental contract, there was work by the company in the
summer of 1896 to complete the work in accordance with
the requirements of the original contract, and as it is claimed
by the company that the work was then completed, it is not
apparent how an arbitrary sum of $250, applicable enough
perhaps in the previous condition of the work, can be held
to be equally applicable in the subsequent stage. If, after
the work of the company's employees in the summer of
1896, there was still deficiency either in the quantity or
quality, the record is wholly without proof of the amount
of it, or of the sum of money that would be necessary to
supply the deficiency. It appears to us, therefore, that the
deduction of the sum of $250 from the complainant's de-
mand is unwarranted. The proper deduction, if any, to be
made may be more, or it may be less. What we hold is,

that there is no testimony whatever to show what it should be. And in this view of the case, we think that the cross-appeal of the complainant, which is aimed at this deduction, should be sustained.

In the complainant's claim of $1,561.50 there is included a charge of $406.50 for extra work, the remainder of the claim being for the work under the original contract. This charge of $406.50, being the aggregate amount of three several items, was included in the bill presented by the complainant to the architect on October 16, 1895, and which was certified by the latter as correct, with the exception of one of three items, $36, which was disapproved and erased. Unless there is testimony to overcome this ruling of the architect, and we find no such testimony in the record, the claim for extra work must be reduced from $406.50 to $368.50. This extra work is referred to in the supplemental contract of December 11, 1895; and it is there stated that "the quantity of this work is still in dispute, and the ascertainment of exact quantities of such extra work is reserved for consideration between the parties at the time of final adjustment when contract work is entirely completed." It does not appear what effort, or whether any effort, was made to ascertain this quantity; and, in view of the provisions of the supplemental contract, there should.have been some testimony on this point.

But these are minor details; the main controversy remains to be adjusted. Did the complainant company perform its work under the contract in accordance with the requirements of the contract? If it did not, whose was the fault for the failure? And if the work was not performed in accordance with the requirements of the contract, what was the amount of the deficiency, and what is the proper amount to be deducted from the contract price on account of such deficiency? Unfortunately the testimony does not afford to us the means of answering these questions satisfactorily to ourselves. The testimony is mainly confined to

the exposition of the circumstances and conditions that obtained during the summer and autumn of 1895, and to a manifestation of the bickerings and misunderstandings that then occurred between the parties. But all this, in our opinion, has been practically eliminated from the case by the action of the parties themselves in formulating the supplemental contract of December 11, 1895. This contract was a virtual condonation by each party of the shortcomings on the other side. It was an acknowledgment that there had been shortcomings on both sides, that the original contract had not been completed in accordance with its terms, that the amount of the extra work remained to be ascertained, that payments had not been punctually and properly made, and that there had been interruption of the work by improper interference on the part of the owners of the building. But it was then and there agreed that all the past should be condoned, that the company should thereafter be permitted to enter upon the work and complete it in accordance with the requirements of the contract, and that there should then be prompt payment for it. The previous misunderstandings were thereby eliminated; and we can not understand why, in view of this supplemental contract, which was intended to be an adjustment of the whole and entire difficulty, so much space should have been given in the testimony to the matters that happened before December, 1895. The important inquiry is, not what happened before December 11, 1895, but what happened after that date. Did the complainant company after that date make good its undertaking in that supplemental contract to complete the work in accordance with the requirements of the original contract? And if it did not, wherein and why did it fail to do so? And what was the extent of its failure, if any there was? These are the questions to be determined; and upon these the testimony throws little or no light.

It would seem that on December 11, 1895, the complainant

company thought that it could remedy any existing defects in the work; for, by the supplemental contract of that date, it undertook to remedy all such defects by its agreement *to complete the work in accordance with the terms of the original contract.* It may be that there was defect of judgment in assuming that this could be done; but certainly there was the undertaking to do it. Now, it is quite evident that it was not done; for to that effect is not only the testimony on behalf of the defendants, but likewise the testimony of the complainants' own witnesses. They all admit that the work was not of the first class, and content themselves with saying that it was done as well as could be under the circumstances. This may be correct; and it may be that there were defects in the original work, occasioned possibly by undue interference on the part of the owners, which could not be remedied. But this leaves unexplained the undertaking of the company in the supplemental contract to make the work such as was contemplated by the original contract.

The testimony, we think, is wholly insufficient on which to base a decree. It is very evident to us that the complainant company is entitled to a recovery to some extent; but the amount of that recovery we are unable to determine; and greatly as we regret to subject the parties to further expense and delay in the matter, we are compelled to make such disposition of the case as will enable the court to come to a satisfactory determination of that amount. This may be had either by reference of the cause to the auditor of the court, with authority to take further testimony, if need be; or by submission of the question to a jury by the formulation of issues under the direction of the court, or by the institution of an independent suit.

It is our conclusion that the decree appealed from should be reversed, with costs to be equally apportioned between the complainant company, on the one part, and the defendants, Albaugh and Painter, on the other; and that the cause should be remanded to the Supreme Court of the District of

Columbia, with directions to dismiss the bill of complaint as to Mrs. Harriet S. Blaine; and with directions further, in the discretion of that court, either to refer the cause to the auditor of the court for a finding of facts by him upon the testimony in the cause and such other testimony as may be adduced before him, or to have issues formulated by the parties for the determination of the facts by a jury, or to permit the parties, under the control and direction of the court, to institute an independent suit at common law for the determination of such facts; and for such further and other proceedings according to law, and not inconsistent with this opinion, as may be right and proper. *And it is so ordered.*